IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JONATHAN FRISE,
      Plaintiff,

vs.                                   Case No. 3:05cv211/MCR/EMT

JO ANNE B. BARNHART,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (the Act) and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) and supplemental security income (SSI) benefits under Titles II and XVI of the Act.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commission should be affirmed.

I.      PROCEDURAL HISTORY

      This suit involves two applications made under the Act. The first is an application for DIB under Title II of the Act, 42 U.S.C. §§ 401 *et. seq.* The second involves an application for SSI benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et. seq.* Plaintiff's

applications were denied initially and on reconsideration (Tr. 15).[1]   On December 10, 2004, following a hearing, an administrative law judge (ALJ) rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 15-29).   On May 16, 2005, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 6-8).   The Appeals Council's action made the ALJ's decision the final decision of the Commissioner and, therefore, subject to review in this court.   Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998). Plaintiff's appeal from the final decision of the Commissioner is now before this court.

II.   FINDINGS OF THE ALJ

On December 10, 2004, the ALJ made several findings relative to the issues raised in this appeal (Tr. 15-29).  The ALJ found that:

1)   Plaintiff met the insured status for disability purposes July 23, 2002, the date he last performed substantial gainful activity, and continued to meet them through December 10, 2004, the date of the ALJ's decision.

2)   Plaintiff has not engaged in substantial gainful activity since July 23, 2002.

3)   Medical evidence establishes that Plaintiff has severe impairments of hypertension, obesity, anxiety disorder NOS, depressive disorder NOS, and personality disorder NOS, but Plaintiff's severe impairments do not meet or equal any listing.

4)   Plaintiff's allegations of subjective complaints and functional limitations are not supported by objective evidence in the disabling degree alleged and, therefore, lack credibility.

5)   Plaintiff retains the residual functional capacity (RFC) to perform work activity at the medium exertional level on a sustained basis.

6)   Plaintiff is a younger individual with more than a high school education.

7)   Plaintiff's last job of janitor is unskilled work performed at the medium exertional level, and the exertional and nonexertional requirements of the job of janitor do not exceed Plaintiff's current RFC for unskilled work performed at the medium

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on August 24, 2005 (Doc. 9).

exertional level.

8)      Considering Plaintiff's age, education, vocational background, and RFC, he can return to his past work as a janitor as that job is generally performed in the national economy.

9)      Plaintiff was not under a "disability," as defined in the Act at any time through December 10, 2004.

(Tr. 28-29).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.

<u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g)[2], the Commissioner analyzes a disability claim in five steps. The steps are:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national

---

[2]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. § § 404, 416). Therefore, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.   Personal History

Plaintiff testified at a hearing before the ALJ on September 13, 2004 as follows (Tr. 364-93). Plaintiff was thirty-six at the time of the hearing (Tr. 368).  He attended a Christian school through the twelfth grade and received his GED in May 1995 (id.).

During the day, Plaintiff takes care of his mother because she is disabled (Tr. 374).  He drives her around and helps with the dishes, laundry, and vacuuming (Tr. 375).  He watches television, and he attends church as often as he can (Tr. 377, 386).  Plaintiff lives with his sister and brother, but does not get along well with them because they are controlling and tell him what to do (Tr. 386-87).   Plaintiff worked as a janitor in the late 1980's and early 1990's, but was fired "for something [he] didn't do" (Tr. 378-79, 391).  Plaintiff worked at Wal-Mart in 1996 and 1997, but was fired because a department manager "lied about [him] and said [he] threw a temper tantrum" (Tr. 369-70). From September 1998 until March 1999, Plaintiff worked at Easy Serve, cleaning the store at night (Tr. 382).  He was fired because some of the associates lied to the manager, stating that Plaintiff was slow and did not do his work (Tr. 383).  Plaintiff worked for the Census Bureau in 2000 for several months, but was fired because an employee reported he had refused to cooperate (Tr. 384).   Plaintiff also worked at Winn-Dixie for two weeks, but was fired when customers reported he was cussing in the parking lot while collecting grocery carts (Tr. 383).  According to Plaintiff, this also was a lie (id.).  In early 2001, Plaintiff worked for Able Body as a transportation driver and also at Bealls as a cashier (Tr. 384).  He was fired from Able Body, and he quit working at Bealls because he was about to be fired (Tr. 385).  Plaintiff worked for West Telemarketing from December 2001 until July 2002 selling products advertised on television (Tr. 370).  He was fired from West for not being able to maintain the required fifty percent order conversion (Tr. 371).

Plaintiff believes nothing about his condition would prevent him from working at Wal-Mart (Tr. 372).  He has a driver's license and feels that nothing would prevent him from driving a cab,

except that his mother would not allow it because she is "afraid of the bad element that's associated with driving a cab" (Tr. 374).  Plaintiff wants to work and feels he is capable of doing jobs he has done in the past (Tr. 390-91).

Plaintiff went through Vocational Rehabilitation (VR) in 2001 and was put through counseling, where it was determined that he needed to be on medication and attend therapy with a counselor (Tr. 379).  Plaintiff refused because he did not feel that he needed that at the time (*id.*).  He went through VR again in 2004 because he wanted help in going to school (Tr. 380).  He does not see a doctor or counselor regularly; he only did so when it was required by VR (Tr. 373).

B.    Relevant Medical History

Plaintiff was referred to John F. Duffy, Ph.D., by his VR counselor for personality, intellectual, and achievement testing (Tr. 233-41).  Dr. Duffy met with Plaintiff for the evaluation on December 13, 2000 (Tr. 233).  Plaintiff was alert, oriented, and cooperative (*id.*).  Plaintiff's mood was anxious, he reported sensitivity to what others might think of him, and he stated that he expected criticism (*id.*).  His thought processes were organized and goal directed, but thought content reflected numerous anxieties, worries, and defensive justifications (*id.*).  Plaintiff claimed his mood was unstable, and sometimes he felt very happy and sometimes he felt sad (Tr. 233-34).  He was overheard singing to himself while performing some of the tests and admitted he spontaneously sings at other times (Tr. 234).  Dr. Duffy noted that Plaintiff appeared to have a paranoid like sensitivity without any formed delusions (*id.*).  Plaintiff also admitted to anxiety about living alone and fear of his own sexual impulses (*id.*).  His reasoning and insight were markedly underdeveloped, and he appeared to be "quite psychologically conflicted, guilt ridden, and anxious" (*id.*).

Dr. Duffy noted that Plaintiff had an unusual family background (Tr. 235).  He was born in Pensacola and has one brother and three sisters (*id.*).  When he was eight years old, the family moved to a Christian community farm where the community tried to keep their lives separate from the modern world (*id.*).  Before that time, from ages one to eight, Plaintiff recalled his father beating him and his siblings with sticks or belts, sometimes at the direction of his mother (*id.*).  While in the Christian farm, Plaintiff's father was hearing voices and demons and became quite bizarre (*id.*).  His father was committed to the state hospital, and Plaintiff and his family moved to another Christian

farm and remained there until his mother "had a situation with the elders" about raising her children (*id.*).  Plaintiff graduated from a private Christian high school that was not state accredited (*id.*).  He later earned his GED and took accounting classes at Pensacola Junior College (PJC), but quit due to the problems that developed at Wal-Mart (*id.*).

Plaintiff currently lived with his mother, his brother who had never been married and never lived on his own, and one sister (Tr. 236).  Plaintiff had never moved out of his home except for two brief times when he lived with siblings (*id.*).  Plaintiff reported he was afraid to live alone because he should take care of his mother and if he lived alone he "might be the raunchiest and most sinful person" (*id.*).  Dr. Duffy opined that Plaintiff was very repressed, in part due to his religious beliefs and influences (*id.*).  Plaintiff felt guilty because he watched Baywatch, and his mother did not like him to watch such shows (*id.*).  His pastor had also spoken with him and "helped him get away from these evil practices" (*id.*).  Plaintiff had never dated, but admitted that he had masturbated and felt extremely guilty (*id.*).  Plaintiff reported that while he has kept it a secret, his mother accused him of being evil and masturbating, but he denied it because "she would have [him] committed if she knew" (*id.*).

Plaintiff admitted he could get angry, loud, and argumentative with his mother and siblings, but he also felt intensely loyal to them (*id.*).  He had never had friends outside the family and stated that his "mother doesn't want [him] to have friends because they would influence [him] to do bad things such as drink or smoke" (*id.*).

On the WAIS-III, Plaintiff scored in the low average intelligence range (Tr. 236-37).  Overall, his verbal abilities were substantially stronger than his visual motor perceptual abilities (Tr. 237).  Dr. Duffy documented that he was inclined to attribute the lowered scores on the performance sub-tests to Plaintiff's anxiety and concern about how he would be judged, which led to interference in mental speed and concentration (*id.*).  Dr. Duffy noted this would be consistent with Plaintiff's reported history of apparently making mistakes when he feels he is under pressure, particularly when called upon to perform visual motor tasks (*id.*).  However, Dr. Duffy also noted that the fact Plaintiff had been discharged from jobs due to slow performance raises the question of some cognitive processing deficits in terms of visual spatial organization that might be further explored (*id.*).  Dr. Duffy further noted that Plaintiff fell in the borderline range on social reasoning, which would

correlate with his history of reported deficient judgment in cooperating with others at work (*id.*).

On the WRAT-III, Plaintiff scored at a high school to post high school level in basic academic skills (Tr. 238).  Dr. Duffy opined that Plaintiff had the basic academic skills and verbal intellectual level to pursue college level or vocational school training (*id.*).

On the Personality Assessment Inventory (PAI), Plaintiff's response pattern was unusual in that it had a combination of excessive defensiveness with a denial of personal shortcomings and a tendency to utilize repression or denial as primary defenses (*id.*).  Dr. Duffy opined that this suggests Plaintiff has deficient insight and is likely unaware of problems his behaviors or attitudes may present to others (*id.*).  Dr. Duffy noted that at the same time, Plaintiff described some concerns at a greater level of intensity than defensive persons usually do (*id.*).

Dr. Duffy documented that the clinical scales were within normal limits, as would be expected given the defensive nature of the profile, except for the Anxiety-Related Disorders scale, which was significantly elevated (*id.*).  Overall, the profile reflected a gentleman who has marked difficulties with anxiety-related symptoms, is tense, phobic, likely monitors the environment, and anticipates criticism, rejection, and denigration (Tr. 239).  Plaintiff may have multiple phobias approaching agoraphobia at times (*id.*).  Others may see him as inflexible, unyielding and stubborn, as well as a perfectionist having a high need to follow his routines (*id.*).  Plaintiff may ruminate about matters to the point where he has difficulty concentrating (*id.*).  He appears to fear his own impulses and doubts his ability to control them (*id.*).

Dr. Duffy opined that there were no indications of hallucinations or delusions, antisocial characteristics or mania, depression, or substance abuse (*id.*).  Dr. Duffy documented that interpersonally, Plaintiff seemed very uncomfortable in social situations and would rather avoid social interactions than run the risk of being exposed to discomfort, ridicule, or rejection (*id.*).  Dr. Duffy's diagnoses were: anxiety disorder, rule out social phobia, rule out obsessive compulsive disorder; personality disorder, NOS, with obsessive compulsive and dependent traits most prominent; obesity;  problems with primary support, social environment, and occupation; and a

current global assessment of functioning (GAF) of forty[3] (*id.*).

Dr. Duffy observed that Plaintiff's assets included an average range of verbal intelligence, average to above average basic academic skills, he was not "overtly psychotic," did not abuse drugs or alcohol, had no history of illegal behavior, had a driver's license, had attempted work on numerous occasions, and he acknowledged distress and wanted help (Tr. 240).  Dr. Duffy also observed that Plaintiff had liabilities, "which will present substantial difficulties for him" (*id.*).  His liabilities included:  childhood history of apparently severe physical, emotional, and verbal abuse; continuing sense of victimization and discord within his family; never having lived independent of the family; markedly restricted social network with no age appropriate peer activities; significant internal tension and rigidity related to his history of abuse exposure; significant psychological conflict regarding normal thoughts and wishes which are perceived as sinful or wrong; deficient interpersonal skills; deficient insight; self-soothing behaviors such as singing or humming, which are socially inappropriate in public or work settings; paranoid like sensitivity and fear of rejection, which leads to continued withdrawal from social settings; history of repeated failure in job settings due to reported inappropriate impulsive expressions of anger or slow work performance, probably due to rigidity and obsessive compulsive personality features; and obesity (*id.*).

Dr. Duffy opined that Plaintiff was "in great need of psychotherapeutic intervention" (*id.*).  Dr. Duffy further opined that Plaintiff's conflicted sense of identity, discomfort with this thoughts and feelings, strongly ambivalent relationship with his mother, and fears of being exposed to ridicule, were all factors that interfered with his ability to engage in age appropriate social interactions and to maintain consistent and gratifying work (*id.*).

Plaintiff began therapy with Dr. Duffy on February 21, 2001 and returned on February 28,

---

[3]Global assessment of functioning is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  Global Assessment of Functioning, available at *http://www.behavenet.com/capsules/disorders/GAF.htm* (last visited March 9, 2006).  It may be expressed as a numerical score.  *Id.*  A score between 31 and 40 reflects some impairment in reality testing or communication (e.g., speech is at times  illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work).  Global Assessment of Functioning, available at *http://dpa.state.ky.us/library/manuals/mental/Ch22.html*  (last visited March 9, 2006).

2001 (Tr. 232). Dr. Duffy noted that Plaintiff sounded paranoid in their sessions and was also very excitable, loud, angry, and then contrite (*id.*). Plaintiff projected blame, but was also defensively grandiose (*id.*). He had spontaneous vocal and behavorial outbursts and was extremely rigid, demanding, and blaming (*id.*). Dr. Duffy documented that Plaintiff "grossly distorts and misbelieves what is said even within sessions" (*id.*). Plaintiff's insight was poor, and Dr. Duffy did not believe Plaintiff realized how he acted (*id.*). The anger and paranoia concerned Dr. Duffy, and he informed Plaintiff and his mother that he should see a psychiatrist for medication (*id.*). Plaintiff stated he would do it because his mother wanted him to do so (*id.*).

Dr. Duffy saw Plaintiff twice in March 2001 for psychotherapy (Tr. 231). Dr. Duffy noted that Plaintiff had seen Dr. Montes and received a prescription for Risperdal, but had not filled it (*id.*). Dr. Duffy encouraged him to fill the prescription because he felt it may help with tension, emotional outbursts, and thinking problems (*id.*). Dr. Duffy noted that Plaintiff was working two jobs at the time, but felt he could not keep up with the pace expected at either of them (*id.*). Dr. Duffy further noted that this had happened at other jobs where Plaintiff focused on certain details and ignored other job expectations, which resulted in him being fired (*id.*). Dr. Duffy stated they were beginning to address Plaintiff's perplexity at the way he saw things so differently from others (*id.*).

Dr. Duffy saw Plaintiff twice in April 2001 for continued therapy (Tr. 230). Dr. Duffy noted that Plaintiff had been reluctant to take medication, but had started it at the end of April (*id.*). Plaintiff spoke of his "conflicts with supervisors at both of his jobs - he's too slow; can't focus or process information efficiently; talks back and argues, etc." (*id.*). Plaintiff talked openly about feeling picked on and singled out (*id.*). He was very rigid in his behaviors and thinking, and he had a hard time adapting to situational demands (*id.*).

In May 2001, Dr. Duffy saw Plaintiff for five therapy sessions (Tr. 229). He had been fired from both of his jobs (*id.*). He refused medication and was beginning to talk openly about being "paranoid but not schizophrenic" (*id.*). Dr. Duffy noted that he was indeed "very paranoid and becomes angry easily, but denies he would ever act out violently" (*id.*). Dr. Duffy had been trying to build trust in their sessions (*id.*). He had been focusing on Plaintiff's communication and behaviors in his job and at home, but "this wasn't very fruitful because he [could] be illogical and

feel persecuted." (*id.*).

In June 2001, Dr. Duffy saw Plaintiff for individual therapy three times and for family therapy one time (Tr. 228). Plaintiff's mother stated that she saw him as a "demon possessed" and cited his temper, loudness, and intrusive behaviors as troublesome (*id.*). Plaintiff had been less volatile in sessions and wanted to work, but saw people as conspiring against him (*id.*). Dr. Duffy continued to openly discuss his frustrations with him and informed Plaintiff that anti-psychotic medication might help (*id.*).

Plaintiff was seen by Dr. Duffy twice in July 2001 (Tr. 227). Plaintiff continued to search for jobs without success (*id.*). He had applied for DIB, which Dr. Duffy endorsed (*id.*). Plaintiff continued to fear taking medication, and Dr. Duffy continued trying to help Plaintiff react less angrily and develop alternate ways of viewing events (*id.*).

In August 2001, Plaintiff was seen by Dr. Duffy on four occasions (Tr. 224). Dr. Duffy stated that Plaintiff was "pleasant as long as you don't push him" (*id.*). When Dr. Duffy did "probe, recommend, advise or confront, he [became] louder, tense, and [talked] of how everyone has conspired against him and lies about him" (*id.*). When Dr. Duffy made suggestions about exercise or activities, because Plaintiff did not like being obese, Plaintiff would reject them and make excuses (*id.*). Plaintiff stated he had his own ideas about how things should be and he could not or would not budge (*id.*). Dr. Duffy opined that this is why Plaintiff had conflicts on the job and with family (*id.*). According to Dr. Duffy, even when Plaintiff "knows his behaviors cause upset to others, he rigidly persists in doing them, as if its [sic] a compulsion - yet he insists its [sic] within his control and his right to do things his way" (*id.*). Dr. Duffy noted that Plaintiff was enrolling at George Stone Career Center for hotel management and opined that "[i]nterpersonal conflict will be the Achilles heel of his plans to work" (*id.*).

Dr. Duffy saw Plaintiff four times in September 2001 (Tr. 222-23). Plaintiff remained "rigidly stuck in his insistence that he [did not] need to change his behaviors or attitudes, and that it was other people who demean and attack him" (Tr. 222). He continued to refuse to take medication "and would take it 'if forced' - and then he says this would once again show that others control him" (*id.*). Dr. Duffy anticipated that Plaintiff would have personality problems in school and work stemming from his paranoid disorder, but was not willing, or possibly able, to handle

stresses differently (Tr. 223). Dr. Duffy informed Plaintiff that he was not sure how else he could be of help (Tr. 222).

Dr. Duffy's last session with Plaintiff was on October 9, 2001 (Tr. 221). Plaintiff continued to be "fed up" with others and saw them as untruthful and obstructive (*id.*). When Dr. Duffy summarized that Plaintiff was let go from six jobs due to complaints of his behaviors or attitudes, Plaintiff stated it was all lies and no one would give him a second chance (*id.*). He was unable to accept that each job had been another second chance (*id.*). Dr. Duffy informed Plaintiff that his hope had been to establish enough of a trusting relationship and/or some curiosity on his part about his personal dilemmas that he would be willing to try medicine and incremental behavior changes (*id.*). Dr. Duffy stated he had not been able to achieve this and opined that further psychotherapy was not likely to improve the situation (*id.*).

C.      Other Information Within Plaintiff's Claim File

Plaintiff was referred to Jose C. Montes, M.D., by his VR counselor for psychiatric evaluation and possible medications (Tr. 215-17). On March 20, 2001, Dr. Montes noted that Plaintiff's father had been committed to Chattahoochee State Hospital because he heard voices and demons, became violent and quite bizarre, and abused Plaintiff and his siblings (Tr. 215). Plaintiff reported he had been overweight throughout his life (Tr. 216). Plaintiff denied having any obsessive-compulsive disorder behaviors, except that he felt he was committing sin and sacrilege because he masturbates (*id.*).

On mental status examination, Dr. Montes noted that Plaintiff was morbidly obese and estimated his weight at 380 pounds (*id.*). Dr. Montes noted Plaintiff was alert and coherent and his thought processes were logical and coherent, however, he had "some flair of paranoidal ideation in his thought content" (*id.*). Plaintiff stated that even when he was in school, he felt people were talking behind his back (*id.*). He admitted feeling hopeless, helpless, and worthless, but denied suicidal ideation (*id.*). Plaintiff stated he did not trust people because they do not "treat him nice or treat him fairly" (*id.*). Plaintiff reported slight anxiety while driving, and stated that he is a loner but gets along well with other people (*id.*).

Dr. Montes' assessment was dysthmia, NOS; probable schizotypal personality disorder; and morbid obesity (Tr. 216-17). Dr. Montes noted that Plaintiff was not receptive to being placed on

medication, but would take it if recommended (Tr. 217).  Dr. Montes prescribed Risperdal and planned to see Plaintiff in follow up in one month (*id.*).  Plaintiff called to cancel his appointment on April 17, 2001, due to work and stated he would call to reschedule (*id.*).  The transcript does not contain any further records from Dr. Montes.

Plaintiff was referred to Lynn E. Lightfoot, Ph.D., by the Office of Disability Determination on September 25, 2001 (Tr. 218-20).  Dr. Lightfoot documented that Plaintiff presented with complaints that he was unemployable, which he believed to be true because of his past history of being fired from six jobs (Tr. 218).  Plaintiff reported that the firings occurred after "people made stuff up about [him] and told the manager" (*id.*).  He stated he was in treatment with Dr. Duffy and had been prescribed medication, but he was not taking it because he was told it would cause sedation and weight gain (*id.*).  He denied any health problems and would only concede that he had a "confidence problem" (*id.*).

Plaintiff reported that his problems with employment first appeared in 1986 when he was working as a clerk at Winn-Dixie (Tr. 218).  He was employed for several months before being let go for having a "bad attitude" (*id.*).  He reported he worked for four years without problems as a janitor at Lakeview Center, until he was transferred to NAS (*id.*).  He was using the restroom one day in December 1993, when he says he was accused of "masturbating naked on the bathroom floor" by the "chief officer" (*id.*).  He was also accused of "choking" the accuser when confronted (*id.*).  Plaintiff denied the behaviors and stated that "he thought the accusation was an 'exaggeration of misunderstanding' what he was doing" (*id.*).  Plaintiff also reported that he was fired from Wal-Mart and is now banned from working at any Wal-Mart in the country (Tr. 219).

Plaintiff denied hospitalizations or previous mental health contacts, except that he acknowledged a previous evaluation and treatment by Dr. Duffy (*id.*).  Dr. Lightfoot noted that he had reviewed Dr. Duffy's report, and it "include[d] excellent detail and assessment that [was] consistent with [his own] assessment" (*id.*).  Plaintiff acknowledged that he was prescribed medication, but refused to take it (*id.*).

On mental status examination, Dr. Lightfoot noted that Plaintiff made good eye contact and spoke in a relaxed and courteous manner (*id.*).  He was alert and oriented in all spheres (*id.*).  He was logical and reasonable, but Dr. Lightfoot opined that "his accounts of work being sabotaged by

individuals telling vicious lies with no foundation seemed unlikely" (*id.*).  Plaintiff was matter-of-fact as he described his job losses and did not waiver from his insistence that the opposition was not provoked (*id.*).  Dr. Lightfoot stated that this "theme of others (including his own family) lying and scheming to get rid of him prevailed throughout the interview" (*id.*).  Plaintiff expressed pessimism that he could escape the influence of this ill will (*id.*).

Plaintiff's affect was flat and his mood dysphoric (*id.*).  He reported that he had no friends and credited his mother with keeping them away (*id.*).  He quoted family members as saying they would like to "kill" him (*id.*).  Plaintiff admitted that he would sometimes lose his temper, but stated that he would only "yell and curse" (*id.*).  He adamantly denied any physical acting out in anger, but he described retaliatory behavior that would be annoying to others (*id.*).  Plaintiff expressed pessimism about his future regarding relationships, employment, and other aspects of life usually considered basic areas of functioning (Tr. 220).  His insight and judgment were limited (*id.*).

Dr. Lightfoot's diagnoses were anxiety disorder, NOS; personality disorder, NOS; obesity; discord with primary family members; history of social dysfunction; history of work problems; and a current GAF of 50[4] (*id.*).  He noted that Plaintiff presented with recurrent social dysfunction and mood disorder and was currently in treatment for the same (*id.*).  Dr. Lightfoot opined that Plaintiff "appear[ed] to have employment potential but [was] enmeshed in a family that is counter to his adjustment in society.  His prognosis is dependent on his involvement in further treatment." (*id.*).

T. Wayne Conger, Ph.D., completed a Psychiatric Review Technique (PRT) on October 12, 2001 (Tr. 242-55).  Dr. Conger opined that Plaintiff met the "A" Criteria of Listing 12.08 (Personality Disorder) in that Plaintiff had inflexible and maladaptive personality traits that caused either significant impairment in social or occupational functioning or subjective distress, as evidenced by seclusiveness or autistic thinking, pathologically inappropriate suspiciousness or hostility, and pathological dependence, passivity, or aggressivity (Tr. 249).  Dr. Conger documented that Plaintiff had mild restrictions in activities of daily living; marked difficulties in maintaining

_____

[4]A GAF between 41 and 50 indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Global Assessment of Functioning, available at *http://dpa.state.ky.us/library/manuals/mental/Ch22.html* (last visited July 24, 2006).

social functioning; moderate deficiencies in concentration, persistence, or pace; and one or two episodes of deterioration and, therefore, did not meet the "B" Criteria of Listing 12.08 (Tr. 252). Dr. Conger noted that Plaintiff had a history of severe social problems, but had the ability to relate effectively at times (Tr. 254).  He further noted that Plaintiff was mentally capable of performing simple, routine tasks independently (*id.*).  Dr. Conger's diagnosis was personality disorder, NOS, with paranoid features (*id.*).

Dr. Conger also completed a mental RFC assessment on October 12, 2001 (Tr. 256-59). According to Dr. Conger, Plaintiff was not significantly limited in understanding and memory or adaptation (Tr. 256-57).  Plaintiff was moderately limited in the ability to work in coordination with or proximity to others without being distracted by them, and in the ability to complete a normal work day and workweek without interruptions from psychologically based symptoms (*id.*).  Additionally, Plaintiff was moderately limited in the ability to interact appropriately with the general public, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness (Tr. 257).  Finally, Plaintiff was markedly limited in the ability to accept instructions and respond appropriately to criticism from supervisors and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (*id.*).

Plaintiff was referred to Frank A. Wood, Ph.D., on August 5, 2003, for a general clinical and mental status evaluation (Tr. 260-63).  Dr. Wood noted that Plaintiff presented himself appropriately in the interview, without emotional liability (Tr. 262).  However, Dr. Wood further noted that "other people would immediately mark him as strange or odd" (*id.*).  Plaintiff was a "very large man" and appeared to look and act younger than his stated age (*id.*).  His voice was high-pitched, almost with a lisp, and he could sound "whiney" at times (*id.*).  He did not present with symptoms of a thought disorder, such as delusions or hallucinations (*id.*).  He reported symptoms of depression, but they were usually episodic, such as after being fired from or turned down for a job (*id.*).  At those times, he has had transient suicidal ideas, but stated he would not commit suicide (*id.*).  However, "he made a strange remark that he might consider suicide more seriously but 'mother won't let me have a gun'" (*id.*).  Dr. Wood noted that Plaintiff appeared "to set up mother as a handy excuse for almost anything." (*id.*).  According to Dr. Wood, Plaintiff was easily anxious, but not anxious on a daily or regular basis (*id.*).  Plaintiff stated that the only mental health treatment he ever had was two years

prior (*id.*).  He stated his mother "forced" him into treatment, although it was recommended by VR (*id.*).  Dr. Wood noted that when the psychologist recommended medication, Plaintiff refused and the doctor stopped treatment (*id.*).

Dr. Wood's diagnoses were generalized anxiety disorder; personality disorder, NOS; obesity; problems with occupation, social environment, finances, and access to health care; and a GAF of 52[5] (*id.*).  Dr. Wood noted that Plaintiff had "entered into a very bad dynamic concerning his mother. He blames her for everything and yet it becomes a self defeating cycle." (*id.*).  Dr. Wood further noted that even when Plaintiff worked, he rarely held a full-time job and limited his socialization (*id.*).  Dr. Wood opined that Plaintiff would do well in therapy if he was motivated, but he believed that Plaintiff "just prefers to live in this rather unproductive dynamic with his mother" (*id.*).  Dr. Wood also opined that it would likely "take something drastic happening before he could be motivated to change" (*id.*).  Dr. Wood felt that Plaintiff's ability to perform work-related activities involving understanding and memory appeared slightly impaired, his ability for sustained concentration and persistence appeared moderately impaired, and his capacity for appropriate social interaction and adaptation on the job appeared markedly impaired (*id.*).  Dr. Wood noted that he reviewed Dr. Duffy's reports to VR from September 2001 to October 2002 (Tr. 263).

Plaintiff was referred to Richard W. Lucey, M.D., on August 13, 2003 by the Office of Disability Determinations for a physical examination (Tr. 264-66).  Plaintiff reported that he had problems with being overweight most of his life, and his feet hurt after standing on them eight to twelve hours a day (Tr. 264).  Dr. Lucey's appraisal was hypertension, bilateral pes planus,[6] and exogenous obesity (Tr. 265).

Robert L. Steele, M.D., completed a physical RFC assessment on August 27, 2003 (Tr. 268-75).  According to Dr. Steele, Plaintiff was able to lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, and he could sit, stand, or walk about six hours in an eight-hour

---

[5]A GAF between 51 and 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."   Global Assessment of Functioning, available at *http://dpa.state.ky.us/library/ manuals/mental/ Ch22.html* (last visited July 24, 2006).

[6]Pes planus is a flat foot deformity.  Pes Planus, *http://www.emedicine.com/orthoped/topic540.htm* (Last visited June 13, 2006).

workday (Tr. 269).  His ability to push/pull was unlimited, other than by his ability to lift and/or carry (*id.*).  Plaintiff could frequently perform postural activities, except that he could never climb ladders, ropes, or scaffolds due to his obesity (Tr. 270).  Plaintiff was also to avoid concentrated exposure to extreme heat and hazards due to his obesity (Tr. 272).  No manipulative, visual, or communicative limitations were established (Tr. 271-72).

Jane F. Cormier, Ph.D., completed a Psychiatric Review Technique (PRT) on September 3, 2003 (Tr. 276-89).  Dr. Cormier opined that Plaintiff met the "A" Criteria of Listing 12.06 (Anxiety -Related Disorders) in that he had generalized anxiety disorder (Tr. 281).  She also opined Plaintiff met the "A" Criteria of Listing 12.08 (Personality Disorder) in that Plaintiff had inflexible and maladaptive personality traits that caused either significant impairment in social or occupational functioning or subjective distress, as evidenced by seclusiveness and pathological dependence and passivity (Tr. 283).  Dr. Cormier documented that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate deficiencies in maintaining persistence, and no episodes of deterioration and, therefore, did not meet the "B" Criteria of Listing 12.06 or 12.08 (Tr. 286).

Dr. Cormier also completed a mental RFC assessment on September 20, 2003 (Tr. 290-93).  According to Dr. Cormier, Plaintiff was not significantly limited in understanding and memory or adaptation (Tr. 290-91).  Plaintiff was moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms (Tr. 291).  Additionally, Plaintiff was moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors (*id.*).  Dr. Cormier noted that Plaintiff was poorly motivated to work outside the home, but appeared capable of doing so (Tr. 292).

On November 21, 2003, Plaintiff was referred to J. Warren Toms, Ph.D., for a general personality evaluation by VR (Tr. 334-42).  Dr. Toms noted that Plaintiff was thirty-five years old, obese, clean, and had a stubble beard (Tr. 338).  He further noted that Plaintiff's social presentation was awkward and rigid, and he was fidgety and very talkative (*id.*).  Plaintiff's eye contact was good, his affect was slightly bland and odd, his mood was overtly euthymic with some element of anxiety, and his speech was rapid (*id.*).

Dr. Toms stated that there was no evidence of a formal thought disorder, but Plaintiff's

thinking was very rigid and odd with a "strong paranoid flavor" (*id.*).  Plaintiff's psychomotor responses were  within normal limits, although Plaintiff tended to be mildly impulsive and fidgety (*id.*).  Dr. Toms noted that while completing a test in a room by himself, Plaintiff "talked very loudly and laughed inappropriately while, at times, reading the [test] aloud" (*id.*).  Dr. Toms opined that Plaintiff's psychological insight and judgment were poor (*id.*).

Dr. Toms' diagnoses were anxiety disorder, NOS; depressive disorder, NOS; and personality disorder, NOS, with paranoid, dependent, and avoidant features (Tr. 340).  Dr. Toms noted that Plaintiff had been evaluated and treated by Dr. Duffy, and after working intensely with Plaintiff, Dr. Duffy concluded that he was not capable of competitive employment and recommended disability (*id.*).  Dr. Toms further noted there was evidence of "considerable social anxiety and excessive worry," and Plaintiff had never developed peer relations and had no friends (*id.*).  Dr. Toms observed that although Plaintiff denied depression, "the MMPI-2 reflects low energy and significant depression as well as significant underlying anger, a prominent paranoid disposition, distrust and suspiciousness, and social introversion/avoidance" (Tr. 340-41).  Dr. Toms also observed that the "Validity Scales of the MMPI-2 reflect a marked lack of psychological mindedness, very rigid thinking, a very unrealistic self-image, and severe personality adjustment issues" (Tr. 341).  Dr. Toms noted that Plaintiff had a long history of interpersonal conflicts in the workplace due to anger, impulsivity, and poor social judgment (Tr. 341).

Dr. Toms' impression was that Plaintiff was "severely impaired from performing competitive employment due to his severe personality disorder which contains paranoid, dependent and avoidant features" (*id.*).  He opined that there may also be an obsessive-compulsive component to Plaintiff's personality that was frequently commented upon by Dr. Duffy (*id.*).  Dr. Toms stated Plaintiff's "social presentation is very rigid, stubborn, opinionated, defensive, and non-cooperative.  He has rejected psychiatric treatment in the past.  With great effort, the client might possibly work in some type of low stress supported environment situation . . . but overall his vocational prognosis is guarded to poor." (*id.*).  Dr. Toms further stated that Plaintiff's "capacity for psychological insight and social judgment is very poor so that significant change in his social functioning capacity is not expected under any circumstances" (*id.*).  Dr. Toms was "sure that a vocational evaluation would provide additional data documenting his poor prognosis" (*id.*).  According to Dr. Toms, Plaintiff has

a "[s]evere personality disorder that is markedly rigid and dysfunctional to the point that he is not capable of competitive employment" (Tr. 342).

Mary E. Seay, M.D., completed a physical RFC assessment on December 11, 2003 (Tr. 303-10).  According to Dr. Seay, Plaintiff was able to lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, and he could sit, stand, or walk about six hours in an eight-hour workday (Tr. 304).  His ability to push/pull was unlimited, other than by his ability to lift and/or carry (*id.*).  Plaintiff could frequently perform postural activities, except that he could only occasionally climb ladders, ropes, or scaffolds due to his obesity (Tr. 305).  Plaintiff was also to avoid concentrated exposure to hazards due to his obesity (Tr. 307).  No manipulative, visual, or communicative limitations were established (Tr. 306-07).

T. Wayne Conger, Ph.D., completed a second PRT on January 1, 2004 (Tr. 311-24).  Dr. Conger opined that Plaintiff met the "A" Criteria of Listing 12.06 (Anxiety-Related Disorders) in that he had anxiety disorder, NOS (Tr. 316).  Dr. Conger further opined that Plaintiff met the "A" Criteria of Listing 12.08 (Personality Disorder) in that Plaintiff had inflexible and maladaptive personality traits that caused either significant impairment in social or occupational functioning or subjective distress, as evidenced by pathologically inappropriate suspiciousness or hostility, persistent disturbances of mood or affect, and pathological dependence, passivity, or aggressivity (Tr. 318).  Dr. Conger documented that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; mild deficiencies in concentration, persistence, or pace; and no episodes of deterioration (Tr. 321).  Therefore, he did not meet the "B" Criteria of Listing 12.06 or 12.08 (*id.*).

Dr. Conger also completed a second Mental RFC Assessment on January 1, 2004 (Tr. 325-28).  According to Dr. Conger, Plaintiff was not significantly limited in understanding and memory or adaptation (Tr. 325-26).  Plaintiff was moderately limited in the ability to work in coordination with or proximity to others without being distracted by them (Tr. 325).  Additionally, he was moderately limited in the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. 326).

Douglas H. Fraser, M.D., performed a psychiatric evaluation of Plaintiff on February 9, 2004 (Tr. 347-49).   At the time of the evaluation, Dr. Fraser did not have a copy of Dr. Toms' psychological report (Tr. 347).  Dr. Fraser opined that there was no indication for antidepressant medication or treatment for an anxiety disorder (Tr. 349).

Finally, Plaintiff was seen by Dr. Toms again, after his evaluation by Dr. Fraser (Tr. 331). On February 19, 2004, Dr. Toms opined that Plaintiff was very manipulative and noted that he became very defiant when he attempted to discuss the apparent contradiction in Plaintiff's participation in VR, while at the same time insisting that he cannot work and claiming entitlement to Social Security DIB (*id.*).  Dr. Toms stated that this "indicates that [Plaintiff] really has no interest in working and prefers to receive Social Security Disability" (*id.*).  Plaintiff stated that his mother would kick him out of the house if he did not contribute financially to the household (*id.*, Tr. 335).

 V.     DISCUSSION

Plaintiff, proceeding pro se, initiated this action by filing a complaint on June 8, 2005 (Doc. 1).  In Plaintiff's complaint, he asserts that the ALJ's decision is a "bunch of lies" because the doctors who treated Plaintiff "all concluded [he was] disabled [and] should pursue disability and receive disability every month" (*id.* at 4).  After Defendant filed an answer to Plaintiff's complaint (Doc. 8), Plaintiff was given an opportunity to file a memorandum in support of the complaint (*see* Doc. 10).  In response, Plaintiff filed a two-page document on December 19, 2005, in which he reiterated his claim that he was found disabled by certain doctors (*see* Doc. 13 at 1).  Additionally, he asserted, "I was denied disability in 2001 based solely on refusal to take medicine and continue therapy sessions with Dr. Duffy - he said 'had I agreed I would have been approved then,' now, 2004, I have two other Doctors - Dr. Fraser and Dr. Toms saying 'no need for medicine of any kind and thus no need for continuing therapy sessions.'" (*id.*).  In light of Plaintiff's pro se status, he was given an additional opportunity to file a memorandum in support of the complaint (*see* Doc. 14), but Plaintiff failed to do so.  Thus, after providing notice to Plaintiff, the court has construed his response filed on December 19, 2006 as a memorandum in support of the complaint (*see id.*).

As directed by the court, Defendant filed a response to Plaintiff's memorandum in support (Doc. 15).  The Commissioner asserts that the final decision of the Commissioner is supported by substantial evidence on the record as a whole and should be affirmed.

A review of Plaintiff's complaint and memorandum reveals that he appears to assert two grounds for relief: 1) the ALJ improperly discounted the opinions of physicians who determined that he was disabled, and 2) Plaintiff was denied disability in 2001 based solely on a refusal to take medicine and continue therapy sessions; thus, because physicians have now said he does not need medication, the decision rendered in 2001 was erroneous.

    A.        The Opinions of Plaintiff's Physicians [7]

        <u>Treating Physician - Dr. Duffy</u> - Plaintiff first met with Dr. Duffy and was evaluated on December 13, 2000.  Plaintiff then began treatment with Dr. Duffy and attended therapy sessions on February 21 and 28, 2001, as well as two sessions in March 2001, two in April 2001, five in May 2001, four in June 2001, two in July 2001, four in August 2001, four in September 2001, and a final session in October 2001.  Dr. Duffy "endorsed" Plaintiff's application for disability benefits in August 2001 (Tr. 227), concluding that Plaintiff "was not capable of competitive employment" (*see* Tr. 340) due to personality problems stemming from his paranoid disorder (Tr. 223).  The ALJ acknowledged Dr. Duffy's opinion, but assigned it little weight (Tr. 25).

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991); <u>Sabo v. Commissioner of Social Security</u>, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* <u>Edwards</u>, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

---

[7]This court will address the opinions that relate to Plaintiff's mental impairments and capacities only, as Plaintiff does not take issue with the ALJ's conclusions regarding his physical capacities.  Moreover, this court has thoroughly reviewed the record and concluded that the ALJ's findings regarding Plaintiff's physical impairments and capacities are supported by substantial evidence in the record.

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

Here, the ALJ provided two reasons for assigning Dr. Duffy's opinion little weight.  First, the ALJ noted that, although Dr. Duffy concluded Plaintiff was incapable of successfully maintaining work activity, he "persisted in setting goals of [Plaintiff] accepting responsibility for his life and sustaining gainful employment" (Tr. 25).  Thus, the ALJ found Dr. Duffy's opinion to be "internally inconsistent" (*id.*).  It is clear from a review of Dr. Duffy's records that he indeed worked with Plaintiff with the ultimate goal of helping Plaintiff integrate into society and the workplace.  Further, it is clear that Dr. Duffy believed Plaintiff was capable of doing so if Plaintiff made incremental behavior changes and took medication.  However, Plaintiff did not follow Dr. Duffy's advice, insisting that he did not need to change his behaviors (Tr. 222).  Similarly, despite Dr. Duffy's recommendations to Plaintiff that he begin taking medication (*see, e.g.,* Tr. 231-32),

Plaintiff refused.  Although Plaintiff reluctantly took some medication near the end of April 2001, after stating he would take medication only because his mother was making him, he refused to take it in May 2001 (Tr. 229, 230, 232).  Dr. Duffy emphasized the importance of medication to Plaintiff in June 2001, to no avail, and Plaintiff steadfastly refused to take medication throughout the remainder of his treatment with Dr. Duffy (*see, e.g.*, Tr. 222-23).[8]

This court does not find that Dr. Duffy's records are necessarily "internally inconsistent." Specifically, Dr. Duffy's conclusion that Plaintiff could not return to work is not inconsistent with his *attempts* to return him to work, because Dr. Duffy believed Plaintiff had the capacity to work. Dr. Duffy was unsuccessful in his attempts to return Plaintiff to work <u>only because</u> Plaintiff refused to take responsibility for his problems or remedy them by making behavioral changes or using medication as recommended.  It is clear to this court, at least according to Dr. Duffy, that Plaintiff is "disabled" because he chooses to be.  In other words, Plaintiff's problems can be adequately addressed through therapy, behavioral changes and/or medication, but Plaintiff has not and will not follow treatment recommendations, including those of Dr. Duffy.

Second, the ALJ found that Dr. Duffy's opinion was rendered in 2001, yet, contrary to Dr. Duffy's opinion, Plaintiff "sustained gainful employment"[9] until July 2002 (Tr. 25).  Indeed, according to Plaintiff's own testimony, he worked for West Telemarketing from December 2001 through July 2002 (Tr. 370).  Moreover, although Plaintiff was fired from the telemarketing job, he was not fired due to personality problems, such as inappropriate interaction with coworkers or supervisors; he was fired for failure to meet sales quotas (*see* Tr. 371).  Thus, the ALJ's second justification for discounting Dr. Duffy's opinion has substantial support in the record.  Moreover, it alone provides substantial justification for assigning little weight to Dr. Duffy's opinion, regardless of whether the first justification is amply supported by the record.

---

[8]Although not noted by the ALJ, failure to follow prescribed treatment can justify denial of benefits.  *See* <u>Schnorr v. Bowen</u>, 816 F.2d 578, 582 (11th Cir. 1987) (pursuant to 20 C.F.R. § 404.1530 (1986), if the Secretary finds that a claimant failed to follow prescribed treatment and that if he had followed the treatment his ability to work would be restored, the claimant may be denied benefits); <u>Patterson v. Bowen</u>, 799 F.2d 1455, 1460 (11th Cir. 1986) (same).

[9]Plaintiff appears to contend that because his <u>employment</u> lasted less than twelve months, it should not be considered "substantial gainful activity" (*see* Doc. 1 at 4).  However, the definition of  "substantial gainful activity" contains no duration requirement.  *See* 20 C.F.R. § 404.1572.  To be disabled, it is the <u>impairment</u> that must be expected to last for a continuous period of not less than twelve months.  *See id.*, § 404.1520.

Dr. Toms - Dr. Toms evaluated Plaintiff in November 2003 and saw Plaintiff three times in February 2004 for therapy sessions. After the initial evaluation, Dr. Toms stated that Plaintiff was "severely impaired from performing competitive employment due to his severe personality disorder . . . ." (Tr. 341). Plaintiff asserts that this opinion should have been accepted by the ALJ. However, the ALJ discounted this opinion, finding that it was "internally inconsistent" because, like Dr. Duffy, Dr. Toms "persisted in setting goals of [Plaintiff] accepting responsibility for his life and sustaining gainful employment" (Tr. 25). Additionally, the ALJ found that Dr. Toms provided no "evidence of decompensation in [Plaintiff's] mental health which would support a finding of disability" (*id.*). Finally, the ALJ concluded that Dr. Toms was not a "treating physician" within the meaning of the regulations (*id.*).

Initially, the opinion at issue was rendered by Dr. Toms after evaluating Plaintiff on only one occasion. Thus, the ALJ was correct in concluding that this opinion was not rendered by a "treating physician." Dr. Toms' subsequent therapy sessions with Plaintiff occurred within a two-week time frame and do not reflect a true or extensive treating relationship. Moreover, the notes from the therapy sessions reveal that Dr. Toms, like Dr. Duffy, believed that Plaintiff was capable of work as long as he was receptive to therapy and would admit to some personal responsibility for his situation (*see* Tr. 332-33). Further, as noted by the ALJ, the treatment notes do not reflect any decompensation by Plaintiff. Notably, they reflect Plaintiff's ability to perform work, contrary to what Dr. Toms initially opined. For example, regarding the telemarketing job, Plaintiff stated that the company changed performance standards after he left, and he could have met the new standards (Tr. 333). More importantly, on the third and final therapy session, Dr. Toms concluded that Plaintiff was manipulative, defiant, and belligerent, indicating to Dr. Toms that Plaintiff really had no interest in working at all and preferred instead to receive disability benefits. Thus, the ALJ was justified in discounting the earlier opinion of Dr. Toms that Plaintiff was incapable of work.

Examining Physicians - Drs. Fraser, Wood, and Lightfoot[10] - Plaintiff was examined by each of these physicians on one occasion. Dr. Fraser, who performed a consultative examination

---

[10]The ALJ did not discuss Dr. Montes' examination, but the court notes that Dr. Montes prescribed Risperdal for Plaintiff and directed that Plaintiff return in one month. Plaintiff neither filled the prescription nor returned for therapy (Tr. 217, 231).

for VR, opined that Plaintiff had no evidence of a mental disorder. As noted by the ALJ, in reaching this conclusion, Dr. Fraser stated that he had thoroughly investigated the possibility of a depressive episode with Plaintiff in the event Plaintiff was minimizing his symptoms or not being completely truthful (Tr. 24, 349). The ALJ assigned determinative weight to Dr. Fraser's opinion, noting that he could not assign controlling weight to it because Dr. Fraser was not a treating physician (Tr. 25). The ALJ correctly noted that Dr. Fraser's opinion was consistent with the opinions of four State Agency examiners, who assessed Plaintiff with no more than moderate limitations in the "domain of maintaining social functioning" (*id.*; *see also* Tr. 286, 289, 290, 321, 326 (revealing findings by each of the four State Agency examiners that Plaintiff had at most moderate difficulties in maintaining social functioning, as well as the opinion of two of those examiners that Plaintiff had poor motivation to work despite an apparent ability to do so)). Additionally, the court notes Dr. Fraser's findings that Plaintiff presented no true symptoms of social phobia or an anxiety disorder; he was pleasant and cooperative during the examination with good eye contact; his speech was fluent, coherent, and of normal rate; there was no evidence of a psychotic process; and Plaintiff's memory, concentration, attention, and judgment appeared grossly intact (Tr. 24, 348-49).

Additionally, the ALJ considered the records of Dr. Wood and assigned little weight to his opinion that Plaintiff's ability for "appropriate social interaction and adaptation on the job appears markedly impaired" (Tr. 22) (emphasis added). The ALJ's stated reasons for assigning little weight to this opinion were its "equivocal nature" and its inconsistency with the opinions of Drs. Fraser, Cormier and Conger (Tr. 22). The ALJ additionally noted that Dr. Wood's opinion was inconsistent with Plaintiff's activities of daily living, such as driving and attending GED classes, and Plaintiff's own remarks to Dr. Fraser (i.e., Plaintiff stated that he is depressed only when he applies for a job and does not get it, he does not worry when he is employed, his social anxiety does not prevent him from looking for a job, and he does not wish to be treated with psychotropic medications) (Tr. 22, 347, 349).

Initially, it does appear that Dr. Wood's opinion is somewhat equivocal. For example, Dr. Wood noted that Plaintiff's mother definitely contributes to Plaintiff's problems, but how much she contributes "is unknown" (Tr. 262). He also stated that Plaintiff would do well in therapy "if motivated," but he felt Plaintiff probably "just prefers to live in this rather unproductive dynamic

with his mother" (*id.*).  Moreover, Dr. Wood assigned Plaintiff a GAF of 52, which indicates only <u>moderate</u> symptoms or <u>moderate</u> difficulty in social, occupational, or school functioning (*id.*).  Additionally, the ALJ did not err in finding that Plaintiff participated in daily activities that were inconsistent with marked difficulties in social interaction and/or job adaptation.  In addition to those activities mentioned by the ALJ, Plaintiff also attended church frequently (i.e., Plaintiff testified that he attended church as often as he could, including services on Friday night, Sunday morning, Sunday night, and sometimes special conferences and week-long meetings at night (Tr. 20, 374-77, 386)) and took accounting classes at PJC (Tr. 235).  Plaintiff also indicated that no other activities had changed because of his condition (Tr. 20, 175).  It is appropriate for the ALJ to consider a plaintiff's daily activities.  <u>Macia v. Bowen</u>, 829 F.2d 1009, 1012 (11th Cir. 1987).

Finally, as noted by the ALJ, Dr. Wood's opinion was indeed inconsistent with those rendered by Drs. Fraser, Cormier, and Conger (Dr. Fraser found a GAF of 70, which represents only some or mild difficulties in social or occupational functioning (*see* Tr. 349)), and both Drs. Cormier and Conger found at most only moderate social or occupational difficulties (*see* Tr. 290-91, 321, 325-26).

The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  *See* <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing <u>Bentley v. Shalala</u>, 52 F.3d 784, 787 (8th Cir. 1995)).  "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." <u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).  Thus, the ALJ did not err in assigning little weight to Dr. Wood's opinion.

Dr. Lightfoot examined Plaintiff and concluded that Plaintiff had "employment potential," but his prognosis was "dependent on his involvement in further treatment" (Tr. 220).  The ALJ mentioned Dr. Lightfoot's examination and conclusions, noting that his conclusions were rendered in September 2001 (Tr. 22).  He further noted Dr. Lightfoot's diagnoses and apparently considered them in finding that Plaintiff has the severe impairments of anxiety disorder, NOS, and personality disorder, NOS, as these were both diagnosed by Dr. Lightfoot (*see* Tr. 22, 220).  Moreover, the ALJ discounted Dr. Wood's opinion, in part, because he did not review Dr. Lightfoot's report before rendering an opinion (Tr. 22).  Thus, although the ALJ did not indicate the weight he assigned to

Dr. Lightfoot's opinions, it is evident that he considered his opinions, as required, in evaluating Plaintiff's claim.[11]  *See* 20 C.F.R. § 404.1527 (if controlling weight is not given to a treating physician's opinion, other medical opinions must be considered).

After evaluating all the evidence of record, the ALJ determined that Plaintiff had severe impairments including anxiety disorder, NOS, depressive disorder, NOS, and personality disorder, NOS, but Plaintiff retained the RFC to perform his past relevant work as a janitor and was, therefore, not disabled within the meaning of the Act.

In reaching this conclusion, the ALJ considered not only the medical opinions of record as discussed above, but also Plaintiff's lack of ongoing treatment and the conservative nature of the treatment Plaintiff sought (Tr. 24-25).  For example, Plaintiff participated in only three psychotherapy sessions during 2004 (Tr. 21, 24, 331-33).  Additionally, in November 2003, Dr. Toms noted that Plaintiff's history of mental health treatment was very limited and for the most part, when recommended, Plaintiff refused prescribed medication for emotional disorders (Tr. 23, 334-36).  The ALJ also noted Plaintiff's own statements about his mental condition (Tr. 20).  For example, Plaintiff indicated that he got along with people in authority, had a good memory, and had no problem concentrating on or completing tasks (Tr. 20, 176-77).  Plaintiff also stated to Dr. Lucey that he did not feel he was depressed, did not want to take prescribed medications, and did not feel he had any emotional problems (Tr. 21-22, 343).  Plaintiff even testified at the administrative hearing that there was nothing about his condition that would prevent him from performing his past job at Wal-Mart, and that he felt capable of doing just about whatever he had done in the past or something even better (Tr. 372, 390).  Similarly, Plaintiff noted that while employed at Wal-Mart, he had an "excellent record" of getting along well with the public (Tr. 176).

Finally, the ALJ properly included in Plaintiff's RFC those mental limitations supported by the record; namely, that Plaintiff was limited to unskilled work with a limitation to only occasional interaction with others, including supervisors (Tr. 26-27).  This RFC is well-supported by the overall record of evidence discussed above, including the nature of Plaintiff's treatment, the findings of Drs. Lucey and Fraser, the conclusions of the four State Agency Physicians, Plaintiff's activities, and

--------

[11]The ALJ did not specifically reject any of Dr. Lightfoot's opinions.

Plaintiff's own statements about his capabilities (Tr. 27).  The RFC adequately takes into account Plaintiff's credible mental symptoms by limiting him to unskilled work with only occasional interaction with others (Tr. 26).

As required in the regulations, the ALJ properly determined Plaintiff's RFC based on his consideration of the entire record.  An RFC is based on all of the relevant evidence in the case record, not just the medical evidence.  *See* 20 C.F.R. § 404.1545.  An ALJ bears the primary responsibility for assessing a claimant's RFC at the ALJ hearing level.  *See* 20 C.F.R. § 404.1546.  In the instant case, the ALJ included only those limitations supported by the record and excluded those that were not.

Finally, after determining Plaintiff's RFC, the ALJ compared the demands of Plaintiff's past relevant work to his RFC (Tr. 27-28, 394-97).  Based on his comparison, the ALJ determined that Plaintiff's RFC did not preclude the performance of his past work as a janitor (Tr. 27-28).  If an individual can perform his past relevant work, either as he performed it, or as the work is performed in the national economy, he is not disabled.  *See* Jones v. Chater, 86 F.3d 823, 825 (8th Cir. 1996); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996); *see also* Social Security Ruling 82-61.  Because Plaintiff retained the RFC to perform his past relevant work as a janitor, the ALJ properly determined that he was not under a "disability" at any time relevant to his decision.  Substantial evidence supports the ALJ's decision.

B.      Denial of Benefits in 2001

Plaintiff's second claim relates to a prior application for disability, which was denied on October 16, 2001 and not appealed (*see* Tr. 15).  Plaintiff has alleged that the prior application was denied solely because he refused to take medicine and continue therapy sessions with Dr. Duffy (Doc. 13 at 1).  Plaintiff asserts that because Dr. Fraser and Dr. Toms have now said he does not need to take medication, the 2001 denial of benefits was erroneous (*id.*).  Initially, Dr. Fraser's opinion was that Plaintiff has no mental impairments.  Plaintiff clearly would not be entitled to benefits on the basis of this opinion, and the court cannot speculate as to how it might have affected an earlier decision of the Commissioner.  Moreover, Dr. Toms' records do not contain an opinion that Plaintiff needed no medication.  Plaintiff may be referring to a notation in Dr. Toms' records that Dr. Fraser did not prescribe any psychiatric medication (Tr. 332).  Dr. Toms also noted Dr.

Fraser's advice to Plaintiff that he "work with" Dr. Toms and "come back on an as needed basis for medication" (*id.*). Although Dr. Toms did not specifically state that Plaintiff needed medication, he initially agreed with Dr. Duffy that Plaintiff was in need of some form of treatment, but Plaintiff was generally resistant to any type of treatment (*see, e.g.*, Tr. 334, 341). In the end, however, Dr. Toms might have changed his mind regarding whether Plaintiff was in need of treatment, as he stated the following concerning his last therapy session with Plaintiff:

> [Plaintiff] stated that he has no interest in psychological counseling, and finally I agreed to put in my report to VR that he did not have to come back for anymore sessions. After he realized that he did not have to come for any more sessions, [Plaintiff] strongly requested that I send my records to Social Security Disability stating that he is not able to work. I questioned [Plaintiff] regarding the contradiction that he is a client of Vocational Rehabilitation, but he wants to get Social Security Disability. At that point, [Plaintiff] completely turned the table and stated that Dr. Duffy, myself, and all of the doctors have said that he cannot work so he should be able to get Social Security Disability. This seems very manipulative to me and indicates that [Plaintiff] really has no interest in working and prefers to receive Social Security Disability. He admits that he is only going through VR because his mother is demanding that he find a job and help provide financially for the household.

Thus, Dr. Toms' final opinion does not support Plaintiff's claim of disability in the instant case. Moreover, this court cannot speculate as to how this opinion might have affected the Commissioner's earlier decision.

To the extent Plaintiff requests that his earlier application be reopened, Plaintiff's request should be denied. The ALJ noted that Plaintiff filed an earlier application for disability, which was denied on October 16, 2001 and not appealed (Tr. 15). The ALJ further stated, "By alleging an onset of disability [in the instant case] commencing within a previously adjudicated period, [Plaintiff] has by implication requested reopening and revision of that determination." (*id.*). However, the ALJ made an "administrative decision not to reopen" the earlier determination (*id.*).

As a general rule, federal courts lack jurisdiction to review an administrative decision not to reopen a previous claim for benefits. *See* Califano v. Sanders, 430 U.S. 99, 107-09, 97 S. Ct. 980, 51 L. Ed. 2d 192 (1977). Moreover, as noted by the court in Byam v. Barnhart, 336 F.3d 172, 180 (2d Cir. 2003) (citation omitted), "The Commissioner's decision not to reopen a prior determination is not a final decision for the purposes of § 405(g), and thus is generally unreviewable even if there

was a hearing in the case." Nevertheless, a federal court may review a decision not to reopen a disability determination if the Commissioner has either constructively reopened the case or if a claimant has been denied due process. Byam, 336 F.3d at 180. A determination shall be deemed "reopened" if it is "reconsidered on the merits to any extent and at any administrative level." Cherry v. Heckler, 760 F.2d 1186, 1189 (11th Cir. 1985) (quoting McGowan v. Harris, 666 F.2d 60, 65 (4th Cir. 1981)). Review by this court is also permissible in "rare instances when the Secretary's denial of a petition to reopen is challenged on constitutional grounds." Califano, 430 U.S. at 109. Accordingly, in the absence of either constructive reopening or a constitutional claim, the district court lacks jurisdiction to review a decision not to reopen. Latona v. Schweiker, 707 F.2d 79, 81 (2d Cir. 1983).

In the instant case, the Commissioner did not constructively reopen any prior disability determination. Indeed, the ALJ specifically stated he was not reopening any earlier determination and noted that any discussion of the medical evidence from before October 16, 2001 was for the "limited purpose of determining the effects of any chronic health problems" on Plaintiff's current level of functioning and "was not intended to reopen the prior final determination of the Commissioner" (Tr. 15). Additionally, a review of the ALJ's entire decision reveals that he did not constructively reopen any earlier determination. *See* Byam, 336 F.3d at 180 (ALJ did not constructively reopen previous applications where he did not rule on their merits, but only assessed whether new evidence existed to establish good cause to reopen them, and nothing in the record indicated that the ALJ's disability determination was based on anything other than evidence submitted as part of the current application). Moreover, Plaintiff has raised no constitutional challenge to the proceedings below, and no violations can be discerned from the record. Thus, this court lacks jurisdiction to review the ALJ's decision not to reopen Plaintiff's previous claim for benefits.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner

be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 2<u>nd</u> day of August 2006.

<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**